UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| A.S., a minor, by and through his Parents and Next Friends, MR. AND MRS. S., Plaintiff, -against- NEW YORK CITY DEPARTMENT OF EDUCATION; JOEL I. KLEIN, in his Official capacity as Chancellor of New York City Schools, Defendants. | 10-CV-9 (ARR) (RML) NOT FOR PRINT OR ELECTRONIC PUBLICATION OPINION & ORDER |

ROSS, United States District Judge:

Plaintiff A.S. (the "student"), a child with autism, brings this action by and through his parents and next friends (the "parents;" collectively with the student, "plaintiffs") pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415(i)(2), for "modified de novo review" of a final administrative decision denying reimbursement of private-school tuition for the 2008-2009 school year. Plaintiffs also assert claims pursuant to Article 89 of the New York State Education Law and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, seeking the same relief. Now before the court are the parties' cross-motions for summary judgment on the basis of the state administrative proceedings. At issue is the adequacy of the individualized education program offered by defendant the New York City Department of Education ("DOE") to provide a free appropriate public education to the student. For the reasons set forth below, the court finds that the DOE offered the student a free appropriate public education. Accordingly, plaintiffs' motion for summary judgment is denied; defendants' cross-motion is granted.

**STATUTORY FRAMEWORK**

"Under the IDEA, states receiving federal funds are required to provide 'all children with disabilities' a 'free appropriate public education [('FAPE')].'" Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007) (quoting 20 U.S.C. § 1412(a)(1)(A)); Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982)). "To meet these requirements, a school district's program must provide 'special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits.'" Id. (quoting Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998) (internal quotation marks omitted)). Such services must be administered according to an individualized education program ("IEP"). 20 U.S.C. § 1414(d). "The IEP, the result of collaborations between parents, educators, and representatives of the school district, sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." Lillbask ex. rel. Mauclaire v. Conn. Dep't of Educ., 397 F.3d 77, 81 (2d Cir. 2005).

New York "has assigned responsibility for developing appropriate IEPs to local Committees on Special Education ('CSE'), the members of which are appointed by school boards or the trustees of school districts." Gagliardo, 489 F.3d at 107 (quoting Walczak, 142 F.3d at 123). "In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." Id. at 107-08. "[T]he CSE must also be mindful of the IDEA's strong preference for 'mainstreaming,' or educating children with disabilities to the maximum extent appropriate alongside their non-disabled peers." Id. at 108.

If a disabled child's parents believe that an IEP does not offer their child a FAPE, they may unilaterally place their child in a private school and seek retroactive tuition reimbursement from the school district. See 20 U.S.C. § 1412(a)(10)(C)(ii); R.K. ex rel. R.K. v. N.Y. City Dep't of Educ., No. 09-CV-4478, 2011 WL 1131522, at *2 (E.D.N.Y. Mar. 28, 2011). In New York, parents present their request for reimbursement at a due process hearing before an impartial hearing officer ("IHO"), whose decision may be appealed to a state review officer ("SRO"). N.Y Educ. L. § 4404; see 20 U.S.C. §§ 1415(f)-(g). The SRO's decision may then be reviewed by a state or federal court. 20 U.S.C. § 1415(i)(2)(A); Gagliardo, 489 F.3d at 108.

## FACTUAL BACKGROUND

The following facts were developed in the state administrative proceedings.

### 1. The Student's Educational History

A.S. is a now twelve-year-old boy who has been classified as a student with autism. See Department of Education Exhibit ("Dist. Ex.") 8 at 1. Because he exhibits self-stimulatory behaviors that include making sounds, placing his hands in his mouth, pulling on his teeth, and twisting his fingers, he requires full-time one-on-one assistance to redirect these interfering behaviors in order to participate in both instructional and non-instructional activities. Impartial Hearing Transcript ("Tr.") 24, 266; Dist. Ex. 14 at 1. A.S. has severe language and articulatory deficits and demonstrated deficits in reading and math. Dist. Ex. 8 at 3; Dist. Ex. 15 at 1. He also has reported deficits in graphomotor and dressing skills. Dist. Ex. 18 at 1.

The student was first diagnosed with autism when he was three-and-a-half years old. Tr. 397-98. At around that time, he began receiving intensive instruction using applied behavior analysis ("ABA"), which resulted in significant improvements in his attention and

communication. Tr. 399. From age four to age seven, A.S. attended general education programs and received the support of a therapist trained in ABA. See Tr. 399-400.

At age seven, during the 2006-2007 school year, A.S. attended a private school that implemented the "DIR/Floortime" teaching methodology developed by Stanley Greenspan, which promotes teaching through play and conversation, and received continued ABA therapy at home. See Tr. at 295-96, 401. A.S. regressed in this program; he engaged in constant self-stimulatory behavior while at school and was unable to stop these behaviors when he returned home after classes. See Tr. 296, 401-02. His parents therefore removed him from the private school after three months and subsequently enrolled him in a collaborative team teaching ("CTT") class at a DOE public school. See Tr. 401, 403.

In the CTT class, Michelle Rodgers, who is a special education teacher, and a general education teacher co-taught a group of about 24 students, some of whom had disabilities. Tr. 18, 21. Ms. Rodgers adapted the curriculum to meet the students' needs and worked with them in whole groups, small groups, and one on one. Tr. 19. In class, A.S. received the support of a full-time ABA-trained one-on-one paraprofessional "shadow;" at home, he received ABA special education teacher support services. Tr. 308-09, 403, 406, 437-38. A.S. initially made progress in the CTT program, where he remained for the 2007-2008 school year, but he began to struggle as the academic demands increased. See Tr. 406-07. The student's parents and teachers determined that he would need a more structured environment for the following, third-grade year. See Tr. 21, 406-07.

**2. The May 2008 Psychological Evaluation**

On May 9, 2008, Virginia Marinelli, a DOE school psychologist, attempted to conduct a psychoeducational evaluation of A.S. to determine whether his "special education services

[were] appropriate and beneficial" for him at that time. Dist. Ex. 14 at 1. She reported that he made no eye contact and exhibited "extreme" self-stimulatory behaviors. Id. Initially she believed that the student lacked verbal ability, but then he began to use one-word utterances and short phrases unrelated to the test questions. Id. Ms. Marinelli attempted to conduct an educational and cognitive test, but she determined that the student was unable to understand or comply with the directions and to respond to the questions and that he was becoming angry and frustrated. Id. She therefore terminated the test. Id. Only as Ms. Marinelli was leaving did the student appear to become aware of her presence. Id.

Since no formal test scores were obtained, Ms. Marinelli observed A.S. in his classroom and during his speech therapy session. Id. In both settings, A.S. engaged in self-stimulatory behavior and was relatively unresponsive. Id. at 1-2. The student's speech therapist told Ms. Marinelli that the student was typically more compliant and responsive. Id. at 2. Jennifer Morrison, the student's paraprofessional shadow, was present during the entire evaluation and agreed the student was typically more responsive. Id. According to Ms. Morrison, Ms. Marinelli could "definitely not" have formed an accurate assessment of A.S.'s cognitive abilities based on her observations because A.S. was much more capable than he was able to demonstrate to her. Tr. 319-21.

Based on her observations, Ms. Marinelli reported, "[I]t appears that [A.S.] would benefit from a small class, 6:1:1, where he is able to receive more individualized, therapeutic instruction with extensive speech and language services." Dist. Ex. 14 at 2.

**3. The June 2008 IEP**

On June 4, 2008, a CSE convened to formulate an IEP for A.S. See Dist. Exs. 8, 10. In attendance were the student's mother; Ms. Rodgers, the student's special education teacher; Ms.

Marinelli, the school psychologist; Angela Mouzakitis, the student's private behavior therapist; the student's general education teacher; and an occupational therapist. See Dist. Ex. 8 at 2; Tr. 36. No one signed into the meeting as a "district representative," see Dist. Ex. 8 at 2, and Ms. Marinelli did not sign in at all, though she conducted the meeting, see id.; Tr. 36-37. Ms. Rodgers was present for only a portion of the meeting and played a limited decision-making role. Tr. 147, 150-51. At the meeting, the CSE developed an IEP recommending that A.S. be placed in a twelve-month program consisting of a 6:1:1 class in a specialized DOE school, plus related services. Dist. Ex. 8 at 1-2. The term "6:1:1" (or "6:1+1") refers to the class's staffing ratio; in a 6:1:1 class, there are six students, one teacher, and one class paraprofessional. Tr. 173.

Based on "TC Assessments,"[1] a writing portfolio, spelling assessments, and informal observations, the IEP reported that the student's math skills were approximately at a beginning first grade level. Id. at 3. The student was reading on a middle kindergarten / early first grade level. Id. He was able to read the lowest level books independently but needed adult support when reading more challenging books. Id. He was able to answer simple "what" questions about a story but had difficulty with "how" and "why" questions. Id. With regard to speech and language, the IEP reported that A.S. had difficulty attending to task and required constant refocusing during speech-language therapy sessions. Id. He was responding more consistently to questions and was then able to label ten school-related items by function and to match the items to the words. Id. Despite these "major advances," the IEP indicated that A.S. continued to require prompting and repetitive questions and was not yet able to apply his skills in the general classroom. Id. According to the IEP, the student's academic management needs included

[1] These "Teacher College Assessments," which were conducted by the CTT classroom teachers, measure decoding abilities, reading, and listening. Tr. 35.

individualized supervision to maintain focus in class and to eliminate distractions, which were exacerbated by self-stimulation. Id. at 4.

With regard to the student's social and emotional performance, the IEP reported that A.S. appeared to enjoy social interactions with his peers and with adults and that he benefitted from preferential seating and adult support in facilitating social interactions within the classroom. Id. at 5. He engaged with other children during recess. Id. The IEP indicated that the student's behavior seriously interfered with instruction, requiring adult support, and that a behavior intervention plan had been developed for him. Id. This plan called for paraprofessional support to keep the student on task during instruction and sought to limit the student's self-stimulatory hand play to only appropriate objects during specific times of the day. Id. at 17.

The IEP contains annual goals and short-term objectives related to writing, reading comprehension, word recognition, math concept skills, problem solving skills, graphomotor skills, ability to use classroom tools efficiently in order to participate in art projects, self-regulation, vocabulary, length of utterance in response to questions, and articulation. Id. at 7-10.

According to the IEP, the CSE recommended that A.S. be placed in a 6:1:1 program because he was functioning significantly below grade level, had language and social deficits, and needed a low student-to-teacher ratio to help him focus. Id. at 14. Related-services recommendations included the provision of a full-time one-on-one behavior management paraprofessional, three 45-minute sessions of one-on-one occupational therapy per week, two 30-minute sessions of one-on-one speech-language therapy per week, and three 30-minute speech-language therapy sessions per week provided in a group of three. Id. at 16. The CSE also recommended home-based services comprised of three 50-minute sessions of one-on-one

speech-language therapy per week and five 60-minute sessions of one-on-one special education teacher support services per week. Id.

The CSE meeting minutes reflect that the student's mother explained to the CSE that she believed that the student needed additional support and individualized instruction as well as multiple and constant opportunities to access typically developing peers throughout the day. Dist. Ex. 10. The minutes also reflect that the team agreed that A.S. needed individualized support, access to typically developing peers, and a structured setting with specially trained professionals to address the problem behaviors that interfered with his learning. Id.; see also Dist. Ex. 8 at 15.

By final notice of recommendation dated July 1, 2008, defendants offered A.S. a placement in a special 6:1:1 class at P.S. 75 in the Robert E. Peary School building. Dist. Ex. 7. Later in July, the student's mother and his home ABA therapist, Melissa Calaprice, visited P.S. 75 at Robert E. Peary. Tr. 359, 414. Although they were able to talk with a teacher and to observe a classroom on their tour, they received no information about the particular class in which A.S. would be placed. Tr. 359-60, 414-17. Based on this visit, the student's mother did not think P.S. 75 would be an appropriate placement for her son because "he need[ed] ABA," an individual curriculum, and one-on-one instruction. Tr. 414-15. Based on her observations, she was also concerned that her son would be inappropriately placed in a class with students on different functional levels. Tr. 418.

By letter dated August 18, 2008, the student's mother advised the CSE chairperson that she was placing A.S. in the Brooklyn Autism Center Academy ("BAC") for the 2008-2009 school year and would be requesting an impartial hearing to pursue public funding for this unilateral placement. Parents' Exhibit ("Parent Ex.") I. She wrote:

> I have visited this placement and determined that is not appropriate to meet [A.S.'s] needs. There are no peer models in the classroom, and no interaction with typically developing children throughout the day. The placement does not offer a consistent and intense methodology. Also, the functional grouping of the students is not appropriate to meet [A.S.'s] needs. Furthermore, the IEP is inappropriate and insufficient to meet [A.S.'s] needs.

Id.

A.S. subsequently enrolled in the BAC and, by all accounts, made significant progress there.

**4. Procedural History of the Reimbursement Dispute**

By due process complaint dated November 24, 2008, the parents requested an impartial hearing to challenge the proposed IEP and to obtain reimbursement for the tuition at the BAC for the 2008-2009 school year. Parent Ex. A. Procedurally, the parents argued that the June 2008 CSE was not validly constituted. Id. at 1. Substantively, they claimed that the IEP was insufficient and inappropriate to meet the student's needs because the proposed placement offered neither appropriate peer models nor opportunities for the student to interact with typically developing peers. Id. In addition, the parents argued that the functional grouping of the students in the proposed placement was not appropriate and that the proposed placement "fails to consistently use a research based method of instruction, as required by the [IDEA]." Id.

a. Proceedings before the IHO

An impartial hearing was subsequently held over three days in the spring of 2009. The IHO took the testimony of Michelle Rodgers, the student's special education teacher in his CTT class; Anthony Loades, an assistant principal at P.S. 75; Angela Mouzakitis, the student's private behavior consultant; Jennifer Morrison, the student's paraprofessional shadow during 2007-2008 school year; Melissa Calaprice, the student's home ABA therapist; the student's mother; the

educational director of the BAC; and, on an issue not before this court, a DOE special education transportation liaison.

Ms. Rodgers, the student's special education teacher, testified to the accuracy of the assessment and the appropriateness of the goals in the IEP. Tr. 33, 37-41. She testified that the student was well adjusted socially in the CTT program but that he required a smaller class where he could receive more behavioral support and individual attention from the teacher. Tr. 21, 29-32, 48, 141. With respect to the IEP's recommendation of a 6:1:1 placement, Ms. Rodgers testified she worried whether such a restrictive placement would expose the student to an appropriate socialization and an academic curriculum but she was unaware of any "medium placement" between a CTT class and a 6:1:1 class. Tr. 32, 47-48, 145-46. Tr. 145-46. Because, she testified, "we don't really know what the make-up of the class will be ahead of time," Ms. Rodgers feared that the student might be the highest functioning child in the class, depriving him of appropriate peer models. Tr. 153. She was not concerned about whether the student would receive sufficient one-on-one attention in a 6:1:1 class, because she assumed that he would continue to have a paraprofessional shadow in that placement. Tr. 141-42, 145.

Mr. Loades, an assistant principal of P.S. 75, testified that the school is a "multi-sited entirely special education organization," with classrooms in several different school buildings. Tr. 163-65. Mr. Loades had never met A.S. or his parents, but he had reviewed the student's June 2008 IEP. Tr. 169-70. Based on his review of the student's IEP and his knowledge of the school's resources, he testified that the student's classroom at P.S. 75 would have been in the P.S. 239 building, which is "across the street" from the Robert E. Peary building. Tr. 223-24. There, Mr. Loades said, A.S. would have fit "both age-wise . . . . and academically" in a

TEACCH-model 6:1:1 class with five other autistic students.[2] Tr. 187-88, 192, 194. In addition, Mr. Loades testified that the student's functional level would have been "right in the middle" of the group. Tr. 194-95. Mr. Loades believed that the TEACCH model of instruction would be the most appropriate for the student. Tr. 177. According to Mr. Loades, TEACCH is a less restrictive methodology than ABA because it is more similar to a general education classroom and it stresses independence through individual work-station activities. Tr. 175, 181, 245-46. Finally, because the student's classroom would be in P.S. 239, a general education building, Mr. Loades stated that the student would have opportunities at breakfast and lunch and certain recreational times to socialize with typically developing children. Tr. 192.

Contrary to Mr. Loades, the student's mother; his behavior consultant, Ms. Mouzakitis; his paraprofessional shadow, Ms. Morrison; and his home ABA therapist, Ms. Calaprice, all testified that they believed that only ABA methodology would benefit the student. See Tr. 275-76, 313-16, 357-58, 414. The educational director of the BAC testified to the progress the student had made through ABA instruction at that school. See Tr. 62-65. Ms. Mouzakitis, in particular, testified at length about why a 6:1:1 TEACCH class would be inappropriate for the student. A professor at Hunter College, Ms. Mouzakitis had thirteen years of experience working with autistic children, including five years working with A.S., and was familiar with both the ABA and TEACCH methodologies. Tr. 260-64. Ms. Mouzakitis testified that her biggest concern for the student was his intensive self-stimulatory behavior, which limited his progress unless he had one-on-one support to redirect these interfering behaviors. Tr. 265-66. According to Ms. Mouzakitis, the CTT program wasn't working for the student because it wasn't individualized enough to meet his behavioral needs. Tr. 268. She thought that only a full-time,

---

[2] "TEACCH" stands for "Treatment and Education of Autistic and Communication related handicapped Children." See Defendants' Local Rule 56.1 Statement of Material Facts Not in Dispute at 11 n.4.

data-intensive ABA program was appropriate for the student, Tr. 275-76, 299-300, 304, and she represented that there had been a "complete consensus" in the June 2008 CSE that an ABA program would be appropriate for the student, Tr. 306. A TEACCH program would not benefit the student, she said, because its focus on independence would lead him to engage in self-stimulatory behavior. Tr. 283. Ms. Mouzakitis also opined that a 6:1:1 class would be inappropriate for A.S. because it has a set curriculum that would not afford sufficient attention to the student's individual needs. Tr. 276. Finally, she testified that the goals and performance assessments described in the June 2008 IEP were inaccurate and insufficiently specific. Tr. 277-78, 302.

The student's mother, Ms. Mouzakitis, and Ms. Morrison further testified that the student would not be able to interact meaningfully with typically developing peers during mealtimes because he becomes overwhelmed by all the commotion in the school cafeteria. Tr. 286-87, 317-18, 420.

At the conclusion of the hearing, the IHO found in favor of the parents, ordering the DOE to reimburse them $85,000 in tuition plus a $1,000 processing fee upon proof of payment. Decision of the Impartial Hearing Officer, dated July 9, 2009 ("IHO Decision") at 17. Without detailed analysis or citation to the applicable law, the IHO concluded, "I am persuaded by the testimony of the parents' witnesses that the Department of Education's program, which employs the TEACHH [sic] methodology, would not have been adequate to meet this student's needs. I find that he requires a more restrictive environment predicated on ABA principles." Id. at 16. The IHO also found that the BAC was an appropriate educational setting for A.S. "since it is predicated on ABA principles" and that the equities favored the parents because they had

cooperated with the CSE. Id. at 17. The IHO did not address the parents' other procedural and substantive arguments.

b. Proceedings before the SRO

The DOE appealed the IHO's decision to the Office of State Review of the New York State Education Department. Upon a thorough review of the hearing record and applicable law, the SRO sustained the appeal and annulled the IHO's order awarding tuition reimbursement. See Decision of the State Review Officer, dated October 5, 2009 ("SRO Decision") at 20.

Substantively, the SRO found that "the June 2008 CSE's recommendation for a 6:1:1 classroom, which employed TEACCH methodology, combined with a 1:1 behavior management paraprofessional and related services consisting of speech-language therapy and [occupational therapy] was reasonably calculated to confer educational benefits on the student." Id. (citation omitted). The SRO concluded that the DOE's use of TEACCH methodology, as opposed to the parents' preferred use of ABA instruction, would not have resulted in a denial of a FAPE because of the progress that A.S. had previously made while enrolled in a CTT classroom and the IEP's provision for the support of a one-on-one paraprofessional for A.S. in the proposed 6:1:1 classroom. Id. at 16-17. In addition, the SRO found that the proposed program would have offered appropriate related services, including speech-language therapy, occupational therapy, and special education teacher support services, to meet the student's unique special education needs. Id. at 17. Finally, the SRO determined that the proposed placement would have appropriately grouped A.S. with other children of his age and ability and would have afforded him sufficient opportunities to socialize with typically developing peers. Id. at 18.

Procedurally, the SRO found that the IEP was not rendered inadequate by absence of an identified district representative on the June 2008 CSE. Id. at 14-15. The SRO dismissed

additional challenges related to the appropriateness of IEP's goals, the evaluation of the student, and the reading and life-skills curricula at the proffered placement on the ground that these challenges had not been included in the due process complaint. Id. at 18. In the alternative, the SRO found these arguments to be without merit. Id. at 18-19. Consequently, the SRO found that the district had offered A.S. a FAPE for the 2008-2009 school year and, therefore, his parents were not entitled to reimbursement of the BAC tuition. Id. at 20.

This action followed.

**STANDARD OF REVIEW**

On a motion for summary judgment in an IDEA case, the court's inquiry is not limited to the existence of genuine issues of material fact. See Lillbask, 397 F.3d at 83 n.3; Wall v. Mattituck-Cutchogue Sch. Dist., 945 F. Supp. 501, 508 & n.6 (E.D.N.Y. 1996). Rather, the court must independently review the administrative record, along with any additional evidence presented by the parties, and determine by a preponderance of the evidence whether the IDEA's provisions have been met. 20 U.S.C. § 1415(i)(2)(C); Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 380 (2d Cir. 2003). In conducting this review, the court may reject administrative factual findings that are unsupported or controverted by the record. C.B. v. N.Y. City Dep't of Educ., No. 02-CV-4620, 2005 WL 1388964, at *13 (E.D.N.Y. June 10, 2005).

Nevertheless, the court's review is "circumscribed." Gagliardo, 489 F.3d at 112. "While the district court must base its decision on the preponderance of the evidence, it must give 'due weight' to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." A.C. ex rel. M.C. v. Bd. of Educ., 553 F.3d 165, 171 (2d Cir. 2009) (internal quotation marks, alterations, and internal citations omitted); see also Bd. of Educ. v.

Rowley, 458 U.S. 176, 206 (1982) (observing that courts may not "substitute their own notions of sound educational policy for those of the school authorities which they review"). Therefore, a district court should not disturb the SRO's decision if it is "reasoned and supported by the record." Gagliardo, 489 F.3d at 114; see also Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 191 (2d Cir. 2005) (stressing that the IDEA demands "substantial deference to state administrative bodies on matters of educational policy"). Deference is due to the SRO's decision, as the final decision of the state, even when it differs from the earlier decision of the IHO. A.C., 553 F.3d at 171. Such deference is particularly appropriate when, as here, the court's review is based solely on the administrative record, A.C., 553 F.3d at 171, and the SRO's review of that record has been thorough and careful, Walczak, 142 F.3d at 129.

"[S]o that disputes related to the education of disabled children are first analyzed by administrators with expertise in the area who can promptly resolve grievances," the IDEA requires an aggrieved party to exhaust all administrative remedies before bringing a civil action in federal or state court. J.S. ex rel. N.S. v. Attica Cent. Schs., 386 F.3d 107, 112 (2d Cir. 2004). Exhaustion "'allows for the exercise of discretion and educational expertise by state and local agencies, affords full exploration of technical educational issues, furthers development of a complete factual record, and promotes judicial efficiency.'" Id. (quoting Polera v. Bd. of Educ. of the Newburgh Enlarged City Sch. Dist., 288 F.3d 478, 487 (2d Cir. 2002)). Consequently, a plaintiff's failure to raise an issue in his or her due process complaint may bar that issue from judicial review. See G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist., 751 F. Supp. 2d 552, 588 (S.D.N.Y. 2010) (citing 20 U.S.C. § 1415(f)(3)(B)); Snyder v. Montgomery Cnty. Pub. Schs., No. 2008-1757, 2009 WL 3246579, at *7 (D. Md. Sept. 29, 2009). But see M.P.G. ex rel. J.P. v. N.Y. City Dep't of Educ., No. 08-CV-8051, 2010 WL 3398256, at *8 (S.D.N.Y. Aug. 27,

2010) (assuming that such issues could be raised for the first time before the district court because the court may review evidence outside the administrative record) (citing 20 U.S.C. § 1415(i)(2)(C)(ii)); M.H. v. N.Y. City Dep't of Educ., No. 09-CV-3657, 2010 WL 1904005, at *18-20 (S.D.N.Y. May 10, 2010) (considering issues not raised in the due process complaint where the DOE itself raised them). Plaintiffs must exhaust their administrative remedies "not only when they wish to file a suit under the IDEA itself, but also whenever they assert claims for relief available under the IDEA, regardless of the statutory basis of their complaint." Cave v. East Meadow Union Free Sch. Dist., 514 F.3d 240, 246 (2d Cir. 2008) (citing 20 U.S.C. § 1415(l)).

**DISCUSSION**

To determine whether the IDEA entitles plaintiffs to reimbursement of private-school tuition, the court engages in a three-step analysis. Cerra, 427 F.3d at 192. The first two steps focus on whether the IEP was adequate to afford the child a FAPE. Id.; see Walczak, 142 F.3d at 129 (citing Sch. Comm. of Burlington v. Dep't of Educ. of Mass, 471 U.S. 359, 370 (1985); Florence Cnty. Dist. Four v. Carter, 510 U.S. 7, 12-14 (1993)). First, the court examines whether the state has complied with the procedures set forth in the IDEA. Cerra, 427 F.3d at 192. Second, the court considers "whether the IEP developed through those procedures is 'reasonably calculated to enable the child to receive educational benefits.'" Id. (citing Rowley, 458 U.S. at 207).

Historically, courts in this circuit placed the burden of proof on the school district to demonstrate the adequacy of the IEP. M.S. v. Bd. of Educ. of the City Sch. Dist. of Yonkers, 231 F.3d 96, 102 (2d Cir. 2000); L.K. v. Dep't of Educ. of the City of N.Y., No. 09-CV-2266, 2011 WL 127063, at *4 (E.D.N.Y. Jan. 13, 2011). More recently, the Supreme Court has ruled

that, in the absence of a specific burden-of-proof provision in the IDEA, the party requesting an impartial hearing bears the burden of proof on all issues. Schaffer v. Weast, 546 U.S. 49, 62 (2005). The Court, however, specifically reserved the issue of whether states may override this "default rule" by enacting legislation placing the burden on the school district. Id. at 61. In 2007, the New York legislature enacted such legislation, which places the burdens of both production and persuasion on the school district for all issues related to the adequacy of the IEP. See N.Y. Educ. L. § 4404(1)(c); L.K., 2011 WL 127063, at *4. Following other district courts in this circuit and in the absence of any challenge by defendants to the New York enactment, this court assumes that New York has effectively shifted the burden of proof on this issue. See G.B. ex. Rel. N.B. v. Tuxedo Union Free Sch. Dist., 751 F. Supp. 2d 552, 573 (S.D.N.Y. 2010); L.K. 2011 WL 127063, at *4.

Only if the IEP was procedurally or substantively deficient does the court reach the third step and ask whether the private schooling obtained by the child's parents was appropriate to the child's needs. Cerra, 427 F.3d at 192. At this step, plaintiffs bear the burden proof. N.Y. Educ. L. § 4404(1)(c).

Finally, in fashioning appropriate relief, "'equitable considerations [relating to the reasonableness of the action taken by the parents] are relevant.'" Frank G. v. Bd. Of Educ. of Hyde Park, 459 F.3d 356, 363-64 (2d Cir. 2006) (alternation in original) (quoting Burlington, 471 U.S. at 374).

**1. Procedural Compliance**

Not every procedural error in the development of an IEP renders that IEP legally inadequate to provide a FAPE under the IDEA. Grim, 346 F.3d at 381-82. "Only procedural inadequacies that cause substantive harm to the child or his parents—meaning that they

individually or cumulatively result in the loss of educational opportunity or seriously infringe on a parent's participation in the creation or formulation of the IEP—constitute a denial of a FAPE." Matrejek v. Brewster Cent. Sch. Dist., 471 F. Supp. 2d 415, 419 (S.D.N.Y. 2007), aff'd 293 Fed. Appx. 20 (2d Cir. 2008). The IDEA instructs that a procedural violation rises to the level of a denial of a FAPE when the violation (a) impedes the student's right to a FAPE, (b) significantly impedes the parents' opportunity to participate in the decision-making process regarding the provision of a FAPE, or (c) causes a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii); A.H. ex rel. J.H. v. Dep't of Educ. of City of N.Y., 394 Fed. Appx. 718, 720 (2d Cir. 2010).

Plaintiffs argue that the June 2008 IEP was rendered infirm by procedural errors related to (a) the notice they received of the student's recommended placement, (b) the constitution and conduct of the CSE, and (c) the evaluation of the student.

a. Notice of Placement

Plaintiffs argue that the DOE failed to provide adequate written notice of the student's placement because the final notice of recommendation incorrectly indicated that A.S. would have attended P.S. 75 in the Robert E. Peary building. Only at the impartial hearing did plaintiffs learn from Mr. Loades that the student's actual classroom would have been located across the street in the P.S. 239 building.

This procedural error was harmless. It did not impede the student's right to a FAPE or deprive him of educational benefits, and it did not significantly impede the parents' opportunity to participate in the decision-making process because, as the Second Circuit recently held, "there is no requirement in the IDEA that the IEP name a specific school location" and the IDEA does not grant parents a "veto" over school choice. T.Y. v. N.Y. City Dep't of Educ., 584 F.3d 412,

420 (2d Cir. 2009); see W.T. v. Bd. of Educ. of the Sch. Dist. of N.Y. City, 716 F. Supp. 2d 270, 289-90 (S.D.N.Y. 2010). Because the parents' right to participate in the development of their child's IEP does not extend to the DOE's decision regarding the particular school site that their child would attend, id., the defective notice did not impede this right . See S.H. v. N.Y. City Dep't of Educ., No. 10-CV-1041, 2011 WL 666098, at *5 (S.D.N.Y. Feb. 15, 2011) (finding that a notice's misidentification of the specific school in a multi-school building was "inconsequential").

In any event, the record establishes that the notice error had no bearing on the parents' decision to reject the placement. Instead, they rejected the placement because it did not comport with their methodological preferences. Asked at the impartial hearing why P.S. 75 was an inappropriate placement for A.S., the student's mother responded, "I want to say he needs ABA . . . it's a way of life for him and for us already." Tr. 414. Because plaintiffs were therefore not prejudiced by the procedural error, it was harmless. See P.P. ex rel. Michael P. and Rita P. v. West Chester Area Sch. Dist., 585 F.3d 727, 738 (3d Cir. 2009) (holding that a delayed evaluation was a harmless procedural error because "the record does not show that the delay had any impact in the plaintiffs' decision to keep [their son in private school]").

b. Constitution and Conduct of the CSE

Next, plaintiffs argue that the DOE violated the IDEA's procedures by failing to provide a qualified district representative at the June 2008 IEP meeting. The IDEA and federal and state regulations require that such meetings include a representative of the local school district who (1) is qualified to provide or supervise instruction specially designed to meet the unique needs of children with disabilities, (2) is knowledgeable about the general education curriculum, and (3) is knowledgeable about the availability of resources of the school district. See 20 U.S.C.

§ 1414(d)(1)(B)(iv); 34 C.F.R. 300.321(a)(4); 8 N.Y.C.R.R. § 200.3(a)(1)(v). A special education teacher or school psychologist on a CSE may also fill the role of district representative. 8 N.Y.C.R.R. § 200.3(a)(1)(v). Both parties agree that no individual signed into the June 2008 IEP meeting as the district representative. Defendants contend, however, that Ms. Rodgers was qualified to serve in this capacity and did serve as the de facto district representative. Plaintiffs counter that Ms. Rodgers was unqualified to serve as a district representative because she was unfamiliar with the programs available in the district, including the program recommended. See Tr. 160 ("I haven't seen [a 6:1:1 site] in a long time."). She did not serve as a de facto district representative, they assert, because her role in the meeting was limited to giving feedback on the student's performance in the classroom. See Tr. 147, 151. Plaintiffs claim that the absence of a qualified district representative denied them a meaningful opportunity to participate in the IEP decision-making process.

The SRO rejected this argument because he found that the district was adequately represented by Ms. Rodgers, Ms. Marinelli, and the general education teacher in the student's CTT class. SRO Decision at 15. In addition, the SRO noted that Ms. Rodgers and the student's mother had discussed possible placements prior to the meeting, id. (citing Tr. 141, 407), and that the student's mother had been able to voice her concerns at the meeting, id. (citing Dist. Ex. 10, Tr. 409). This court agrees. Plaintiffs do not argue, and the record does not suggest, that the DOE had alternative available placements that a proper district representative would have revealed. Therefore, any procedural infirmity related to the absence of an official district representative could not have significantly impeded the parents' opportunity to participate.

Plaintiffs further assert that Ms. Marinelli came to the IEP meeting with a preformed conclusion that a 6:1:1 placement would be appropriate for A.S. because she had already

recommended such a placement in her psychological evaluation report and indicated before the meeting that the DOE had no better options for A.S.[3] See Dist. Ex. 14 at 2; Tr. 274, 410-11. Assuming without deciding that the court may address this argument, which plaintiffs failed to articulate in their impartial hearing request, the court finds that it lacks merit. While a district's close-minded refusal to consider placement options may significantly impede parents' opportunity to participate in the decision-making process, see Deal v. Hamilton County Board of Education, 392 F.3d 840, 858 (6th Cir. 2004), the Second Circuit has refused to infer predetermination from permissible "preparatory activities . . . to develop a proposal or response to a parent proposal that will be discussed at a later meeting," T.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 253 (2d Cir. 2009) (quoting 34 C.F.R. §§ 300.501(b)(1), (b)(3)). As in T.P., the record in this case reflects that the CSE kept an open mind about the content of the student's IEP. See id. (distinguishing Deal and noting that it is not binding authority). In particular, the IEP itself and the meeting minutes reflect that other options were considered and that the parents' concerns were taken seriously by the CSE. See Dist. Ex. 8 at 15; Dist. Ex. 10.

c. Evaluation of A.S.

Finally, plaintiffs argue that the DOE failed to perform a proper evaluation of A.S. to inform his IEP, as required by statute. See 20 U.S.C. § 1414(b)(2)(A). According to plaintiffs, Ms. Marinelli was unable to test A.S. effectively due to his disruptive behaviors; consequently, her evaluation was overly general and underestimated his cognitive abilities, leading to a flawed placement recommendation. This claim was not raised in plaintiffs' due process complaint, and the SRO rejected it on that basis. See SRO Decision at 18. In the alternative, the SRO found that Ms. Marinelli's failure to obtain formal psychoeducational test scores did not impede the

[3] This argument tends to undercut plaintiffs' contention that no one at the June 2008 IEP meeting was familiar with the DOE's resources.

student's right to a FAPE. Id. at 19. Assuming without deciding that plaintiffs may assert this argument, the court agrees with the SRO that any infirmity in Ms. Marinelli's evaluation was harmless. The student's behavior therapist, CTT teachers, related-service providers, and mother all participated in the development of the June 2008 IEP, and they were able to supplement Ms. Marinelli's evaluation with additional information on the student's individual abilities and needs.

**2. Substantive Adequacy**

A school district complies with the substantive provisions of the IDEA when it provides a disabled child with an IEP that is "reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 206-07. A school district is not, however, required to furnish "every special service necessary to maximize each handicapped child's potential," id. at 199, or to provide "everything that might be thought desirable by loving parents," Walczak, 142 F.3d at 132 (internal quotation marks and citations omitted). "Rather, a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'" Cerra, 427 F.3d at 195 (quoting Walczak, 142 F.3d at 130). Therefore, "a court may not second-guess state educators' policy decisions in the effort to maximize a handicapped child's educational potential." Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1121 (2d Cir. 1997); see also Rowley, 458 U.S. at 208 ("[O]nce a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States."). In order to avoid "impermissible meddling in state educational methodology," a federal court reviewing the adequacy of an IEP "must examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan." Walczak, 142 F.3d at 130 (internal quotation marks and citations omitted).

Plaintiffs challenge both (a) the recommendations in the IEP and (b) the specific school site at which the IEP would have been implemented.

a. Appropriate Goals

Plaintiffs argue that the annual goals and short-term objectives stated in the June 2008 IEP were not specific or individualized enough to address the student's unique educational needs. According to plaintiffs, these goals were continued from his previous IEP without discussion and were based on a flawed evaluation of the student's abilities. In addition, plaintiffs argue that the IEP's goals for A.S. were not measurable and failed to dictate a method of measurement, as required by regulation. See 34 C.F.R. § 300.320(a)(3)(i); 8 N.Y.C.R.R. § 200.4(d)(2)(iii)(b). The SRO rejected plaintiffs' challenge to the goals in the IEP because they had failed to raise it in their due process complaint. SRO Decision at 18. In the alternative, the SRO found that "[a]lthough the annual goals appear to be somewhat generally stated, the short-term objectives contain sufficient specificity to provide direction to the student's teachers concerning the expectation of the CSE and were also measurable." Id. (citation omitted). In addition, the SRO found that the goals and objectives were discussed at the meeting and that neither the student's mother nor his private behavior therapist objected to them. Id. at 19 (citing Tr. 39-39).

Assuming without deciding that plaintiffs' argument is preserved for review, this court finds no reason in the record to disturb the SRO's holding that the IEP's goals and objectives were sufficient. "[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." Grim, 346 F.3d at 382. Upon an independent review of the IEP's annual goals and short-term objectives, see Dist. Ex. 8 at 7-10, the court agrees that they contain sufficiently detailed

information to provide direction and enable measurement. In particular, the student's short-term objectives include objective criteria by which to judge progress, including numbers of particular words to master and specific target percentages of accuracy for the student to attain in various tasks, including the number of trials to be performed in order to test the student. They also specify the difficulty level of the books the student should learn to read with specified levels of assistance and the types of questions he should become able to answer about them. This level of detail is sufficient for an IEP to offer a FAPE. See Tarlowe v. N.Y. City Bd. of Educ., No. 07-CV-7936, 2008 WL 2736027, at *9 (S.D.N.Y. July 3, 2008) (finding that an IEP included "sufficiently detailed information regarding the conditions under which each objective was to be performed and the frequency, duration, and percentage of accuracy required for measurement of progress.") (internal quotation marks and citation omitted).

Finally, the court rejects plaintiffs' argument that the IEP's goals were based on an inaccurate and outdated assessment of the student's abilities. Ms. Rodgers testified at the impartial hearing that the IEP's assessment and goals were consistent with her experience with the student. Tr. 33, 38-39. Although Ms. Mouzakitis testified that the IEP's assessment and goals were "incredibly flawed," Tr. 278, her critique, adopted by plaintiffs, is unpersuasive. First, Ms. Mouzakitis opined that the IEP overstated the student's ability to engage independently with other children. See id. On the contrary, the IEP clearly recognized that the student requires adult support to facilitate social interactions because of his interfering behaviors and recommended a full time paraprofessional shadow for him. See Dist. Ex. 8 at 5, 16-17. Second, Ms. Mouzakitis attacked the IEP's observation that A.S. required "verbal cues and minimal assistance." Tr. at 278. This observation was limited to the student's physical "difficulty cutting on a straight line and cutting out shapes." Dist. Ex. 8 at 6. It was patently not

the IEP's overall prescription for behavioral intervention, and it does not render the IEP inaccurate or inadequate.

b. Appropriate Site

Plaintiffs assert several arguments against the appropriateness of the proffered class placement at P.S. 75 in the P.S. 239 building, addressed to the appropriateness of (i) the teaching methodology used, (ii) the student's peer group, (iii) the staffing ratio, and (iv) the special reading and life-skills curricula.

(i) Methodology

"In assuring that the requirements of the [IDEA] have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the States." Rowley, 458 U.S. at 207. A reviewing court may not "meddl[e] in state educational methodology" or "second-guess educators' policy decisions in the effort to maximize a handicapped child's educational potential." Mrs. B., 103 F.3d at 1121; see also Cnty. Sch. Bd. of Henrico Cnty. V. R.P. ex rel. Z.P., 399 F.3d 298, 308 (4th Cir. 2005) ("Neither a state administrative hearing officer nor a reviewing court may reject an otherwise appropriate IEP because of dissatisfaction with the educational methodology proposed in the IEP."). Therefore, the court should defer to the SRO's decision that the chosen methodology was appropriate in the absence of objective evidence to the contrary. See Grim, 346 F.3d at 382-83; Walczak, 142 F.3d at 130.

Plaintiffs argue that the proffered class's use of the TEACCH model of instruction would have been inappropriate for A.S. because only ABA methodology is appropriate to the student's unique learning style and behavioral needs. The IHO had been persuaded by this argument, but the SRO found that TEACCH methodology would have offered the student educational benefits and would not have resulted in the denial of a FAPE. See SRO Decision at 17.

The SRO found, first, that ABA instruction was not the only educational methodology that would have conferred educational benefits on the student. Id. at 16. He reached this conclusion in part because the student had made progress in his CTT classroom until the end of the 2007-2008 academic year, when the academic demands of the class increased. Id. He also observed that the student's mother and behavior consultant did not request the use of ABA methodology during the June 2008 IEP meeting. Id.[4] Next, the SRO found that TEACCH methodology would confer educational benefits on the student. Id. Mr. Loades had testified that he believed TEACCH would be more appropriate for the student than ABA. Id. (citing Tr. 177). Plaintiffs argued to the contrary that TEACCH would not have provided the student with the requisite level of support and intervention to diminish his self-stimulatory behaviors. Id. In particular, plaintiffs presented the testimony of Ms. Mouzakitis and Ms. Morrison that TEACCH would not be appropriate because of its use of individual work stations where, without one-on-one support, the student would engage in high levels of self-stimulatory behavior. Id. (citing Tr. 283-84, 314-15). The SRO observed, however, that Ms. Rodgers believed that a 6:1:1 placement with a paraprofessional shadow would give the student adequate behavioral support. Id. at 17 (citing Tr. 145-46). Because the June 2008 IEP would have afforded the student a one-on-one paraprofessional to address his behavioral impediments to learning, the SRO found that the student's self-stimulatory behaviors would not have rendered TEACCH methodology inadequate for his instruction. Id.

Plaintiffs argue that the SRO erred in relying on the progress that A.S. had made in the CTT program to support his conclusion that ABA was not the only methodology that would have

[4] Plaintiffs fault the SRO's conclusion that neither the student's mother nor his behavior consultant requested ABA methodology at the June 2008 IEP meeting as being unsupported by the record. See Tr. 294, 306-07, 411-12. On its independent review, the court finds the record to be unclear on this issue. In any event, the SRO's decision that the use of TEACCH methodology would have conferred educational benefits on the student does not rest on his view of whether ABA was discussed at the IEP meeting. See SRO Decision at 16-17.

conferred educational benefits on the student. They argue that the SRO's reference to the CTT program was improper because the IEP team had concluded that "the CTT class [was] insufficient for A.S. because it was not a behaviorally based program completely rooted in the principles of ABA." Plaintiffs' Memorandum of Law in Support of their Motion for Summary Judgment ("Pl. Br.") at 24 (citing Tr. 268).

Plaintiffs misread the record. Contrary to plaintiffs' assertions and the testimony of Ms. Mouzakitis, there was evidently not "a complete consensus" that only an ABA program would be appropriate for the student. See Tr. 306. Ms. Rodgers believed that the CTT class was no longer sufficient for the student because he needed a smaller class where he could receive individualized attention from the teacher, not because he needed one-hundred-percent ABA instruction. See Tr. 31-32. While Ms. Mouzakitis testified that the recommended 6:1:1 placement could not accommodate the student's individual needs "because a 6:1:1 class has a curriculum and that is their program," Tr. 276, Ms. Rodgers testified that she thought A.S. needed an academic curriculum so that he could keep up in reading and math, see Tr. 145-46. According to Ms. Rodgers, "any kind of setting" that would offer one-on-one support for redirection, academics, and opportunities for socialization would be appropriate. See Tr. 141-42. Ms. Rodgers stated that she and the student's mother had never specified the exact programming that would be appropriate. Tr. 142. In addition, while plaintiffs' witnesses uniformly testified that ABA instruction would be appropriate, and TEACCH methodology inappropriate, Mr. Loades testified that, on his review of the IEP, TEACCH would be more appropriate. See Tr. 177, 181, 193.

In light of the broad methodological latitude that the IDEA leaves to the states and the deference that this court owes to the SRO on matters of educational policy, the court will not

disturb the SRO's decision that the use of TEACCH methodology would not have denied the student a FAPE. See Rowley, 458 U.S. at 208.

(ii) Peers

Plaintiffs assert that the proffered 6:1:1 class would not have afforded the student with sufficient opportunities to interact with typically developing peers and that defendants failed to establish that the student would be appropriately grouped with children whose needs were similar to his. See 8 N.Y.C.R.R. §§ 200.6(a)(3), 200.6(h)(2) & (3). The SRO found that there would have been sufficient interaction because of the class's setting in a general education school, where A.S. would have had opportunities to interact with general education students during breakfast, lunch, and certain recreational times. SRO Decision at 18 (citing Tr. 192, 258).[5] With respect to grouping, the SRO credited the testimony of Mr. Loades that the student would fit in the proffered class "age-wise, grade-wise and academically" and that his functioning level would have been "right in the middle." Id. (citing Tr. 187, 195). The court may not second-guess the SRO's judgment that this level of interaction would be sufficient for the student, especially in light of the student's demonstrated inability to participate fully in a general education or CTT class, nor may it second-guess his supported finding that the student would have been appropriately grouped.

(iii) Staffing

Plaintiffs assert that P.S. 75 in the P.S. 239 building could not satisfy the minimal requirements of the June 2008 IEP because a 6:1:1 staffing ratio might not have been maintained when two classes were combined under one instructor for gym. See Tr. 237. This argument fails because only "a material failure to implement an IEP violates the IDEA." Van Duyn ex rel. Van

[5] In addition, Mr. Loades testified that the student would engage in weekly activities in the classroom to promote appropriate social behavior. Tr. 192-93. The SRO reasonably construed this ambiguous testimony to refer to additional opportunities to interact with typically developing peers. See SRO Decision at 18.

Duyn v. Baker Sch. Dist. 5J, 502 F.3d 811, 822 (9th Cir. 2007). The minor possible discrepancy between the 6:1:1 staffing ratio called for in the student's IEP and the possible 12:1:2 staffing ratio during gym class three times per week is not material, especially since A.S. would have been accompanied to gym by his own paraprofessional shadow. See A.P. v. Woodstock Bd. of Educ., 370 Fed. Appx. 202, 205 (2d Cir. 2010) (finding that failure to provide a teacher's aide as the IEP recommended did not constitute a material failure of implementation).

(iv) Special Curricula

Finally, plaintiffs argue that the SRO improperly dismissed their claims related to the appropriateness of the reading and activities of daily living ("ADL") curricula at the proffered placement. Although plaintiffs received notice of the student's specific classroom recommendation only at the impartial due process hearing, the SRO dismissed their curricular challenges because plaintiffs had not raised them in the due process complaint. SRO Decision at 18. In the alternative, the SRO found that both curricula were adequate for A.S. Id. at 19. The reading curriculum was described as being specifically designed for students of low cognitive abilities and alternatively assessed students, with the capability to support teaching on several different levels for students with varying degrees of autism and mental retardation. Tr. 188. The SRO reasonably determined that this curriculum would be appropriate for A.S., who was autistic, was recommended for alternative assessment, and was functioning significantly below grade level.[6] SRO Decision at 19 (citing Dist. Ex. 8 at 3, 16). The SRO likewise reasonably rejected plaintiffs' argument that the ADL curriculum would be inappropriate and insufficiently individualized for the student. Id. Mr. Loades had testified that the general curriculum would be "differentiated based on the classroom needs." Tr. 235. Although a further individualized

[6] Although the SRO's decision overstates the number of grade levels that the student had fallen behind in reading, the record establishes that the student was "significantly" behind. See Dist. Ex. 8 at 3, 16.

curriculum would almost certainly have further benefitted the student, the DOE need not furnish "every special service necessary to maximize each handicapped child's potential" in order to provide a FAPE. Rowley, 458 U.S. at 199. Therefore, assuming that the court may review plaintiffs' curricular arguments, it defers to the SRO's determination of their merits.

**CONCLUSION**

For the reasons stated above, plaintiffs' motion for summary judgment is denied and defendants' cross-motion is granted. For the same reasons, plaintiffs' claims pursuant to Article 89 of the New York State Education Law and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, are dismissed. See E.H. v. Board of Educ. of Shenendehowa Cent. Sch. Dist., 361 Fed. Appx. 156, 161 (2d Cir. 2009) ("Even if we were to conclude that the School District had violated the IDEA, such a violation, without more, would be insufficient to support a claim of disability-based discrimination under . . . Section 504 of the Rehabilitation Act.). The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

/s/________________________
Allyne R. Ross
United States District Judge

Dated: May 25, 2011
Brooklyn, New York